# IN THE CIRCUIT COURT OF WASHINGTON COUNTY, ARKANSAS

**ANIMAL HEALTH INTERNATIONAL, INC. and**
**WALCO INTERNATIONAL, INC.**                                    **PLAINTIFFS**

**VS.**                        **NO.** _CV12-1050-7_

**IVESCO HOLDINGS, LLC**                                          **DEFENDANT**

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Come now the Plaintiffs, Animal Health International, Inc. ("Animal Health") and Walco International, Inc. ("Walco") (collectively, "Plaintiffs"), and for their Complaint for Injunctive Relief and Damages against the Defendant, IVESCO Holdings, LLC ("IVESCO"), state:

## JURISDICTION AND VENUE

1.      Animal Health is a corporation organized under the laws of the State of Colorado with its principal place of business in the State of Colorado. Animal Health was formerly known as "Lextron, Inc.," and is now the parent company of Walco, which Animal Health acquired in June 2011.

2.      Walco is a corporation organized under the laws of the State of Delaware with its principal place of business now located in the State of Colorado. Walco is a wholly-owned, indirect subsidiary of Animal Health. Since the acquisition of Walco in June 2011, Animal Health has been integrating the operations of Walco and its other operating subsidiaries under the name "Animal Health International." The process of integration is ongoing as of the date of this Complaint.

3.      IVESCO is a limited liability company organized under the laws of the State of Delaware and qualified to conduct business in Arkansas.  IVESCO regularly conducts business in Washington County, Arkansas.   IVESCO is in the business of providing animal health-related products and services, including pharmaceuticals.

4.      This Court has subject matter jurisdiction over this action and personal jurisdiction over IVESCO due to IVESCO's continuous and systematic business contacts within the State of Arkansas.

5.      Venue for this action is proper in Washington County, Arkansas.

## FACTUAL BACKGROUND

6.      Animal Health is a nationwide animal health distributor offering cattle, equine, poultry, swine, cat, and dog animal health products and supplies, including pharmaceuticals. Animal Health was founded in Colorado in 1967, and Walco was founded in California in 1949. Each company began as a regional distributor and grew into a prominent national distributor. Today, Animal Health is one of the largest national distributors of animal health products in the United States.  Animal Health is a direct competitor of IVESCO in the market for such products and supplies.

7.      Recently, three sales representatives at Animal Health – Dave Nelson, Richard Hirsbrunner and Amanda Wroble, resigned abruptly and simultaneously, without notice, without giving any indication of their future employment plans, and generally refusing to communicate with their supervisors or Animal Health's human resources department.   These three sales

2

representatives are now employed by IVESCO for the purpose of competing directly with Animal Health.

### *The Employment Agreements Signed By Nelson, Hirsbrunner and Wroble*

8.     On October 28, 2003, Dave Nelson ("Nelson") signed an Employment Offer Acceptance Agreement with Walco (the "Nelson Agreement"). A true and correct copy of the Nelson Agreement is attached hereto as Exhibit A. Pursuant to the Nelson Agreement, Nelson acknowledged that he would be provided "with access to the company's confidential and proprietary information, including, but not limited to, information regarding Walco products, prices, customer lists, customer preferences, marketing materials, sales plans, and proposals ("Confidential Information")." Nelson also acknowledged that his employer had "put in place certain policies and practices to keep such Confidential Information secret," and that the Confidential Information had been "developed or acquired by Walco through the expenditure of substantial time, effort and money and provides Walco with an advantage over competitors who do not know or use such Confidential Information."

9.     During the course of his employment as a sales representative for Plaintiffs, Nelson did in fact receive Confidential Information from his employer as defined in the Nelson Agreement.

10.     Nelson also agreed in the Nelson Agreement "not to disclose to any person or use at any time, either during or after termination of employment … any secret or confidential information, whether or not developed by [him] …. Secret or confidential Information shall include, but not be limited to, designs, formulas, processes, devices, machines, inventions,

3

research or development projects, plans for future development, materials or a business nature, financial data, legal documents and records, computer software technology, computer systems and programs, and any other information of a similar nature in a form or to the extent not available to the public."

11.    Nelson further agreed in the Nelson Agreement that if he resigned from his employment, he would not engage in any "Competitive Activities" for a period of twelve (12) months following the termination of his employment.   Competitive Activities are defined in the Nelson Agreement as "(i) directly or indirectly (either as principal, agent, employee, employer, partner or in any other individual or representative capacity whatsoever) soliciting, selling or rendering services substantially similar to those performed during [his] employment with Walco to any of the customers solicited, sold to or serviced by [him] on behalf of Walco at any time during the 18 months immediately preceding termination of [his] employment with Walco; or (ii) directly or indirectly, either as principal agent, employee, employer, partner or in any other individual or representative capacity whatsoever, soliciting or inducing any officer, salesman or other employee of Walco to leave his or her employment."

12.    On September 3, 2005, Richard Hirsbrunner ("Hirsbrunner") signed an Agreement for his employment with Walco (the "Hirsbrunner Agreement"). A true and correct copy of the Hirsbrunner Agreement is attached hereto as Exhibit B.

13.    Hirsbrunner acknowledged in the Hirsbrunner Agreement that "all documents (including, but not limited to, correspondence, memoranda, plans, proposal, customer lists, marketing and sales plans, financial or legal documents or records, reports and drawings,

4

formulations, designs, samples, and prototypes), tools and equipment and all other tangible and intangible materials whatsoever, that concern Walco's business and that come into my possession by reason of my employment, are the property of Walco and shall not be used by me for personal gain or in any way adverse to Walco." During the course of his employment as a sales representative for Plaintiffs, Hirsbrunner did in fact receive confidential and proprietary information from his employer.

14.     Hirsbrunner agreed in the Hirsbrunner Agreement "not to disclose to any person or use at any time, either during or after termination of employment … any secret or confidential information, whether or not developed by [him] …. Secret or confidential Information shall include, but not be limited to, designs, formulas, processes, devices, machines, inventions, research or development projects, plans for future development, materials or a business nature, financial data, legal documents and records, computer software technology, computer systems and programs, and any other information of a similar nature in a form or to the extent not available to the public."

15.     Hirsbrunner further agreed in the Hirsbrunner Agreement that he would not engage in any "Competitive Activities" for a period of twelve (12) months following the termination of his employment.   Competitive Activities are defined in the Hirsbrunner Agreement as "[d]irectly or indirectly (either as principal, agent, employee, employer, partner or in any other individual or representative capacity whatsoever) soliciting, selling or rendering services substantially similar to those performed during [his] employment with Walco to any of the customers solicited, sold to or serviced by [him] on behalf of Walco at any time during the 18

5

months immediately preceding termination of [his] employment with Walco; or (ii) directly or indirectly, either as principal agent, employee, employer, partner or in any other individual or representative capacity whatsoever, soliciting or inducing any officer, salesman or other employee of Walco to leave his or her employment."

16.     On August 6, 2010, Amanda Wroble ("Wroble") signed an Employment Offer Acceptance Agreement with Walco (the "Wroble Agreement"). A true and correct copy of the Wroble Agreement is attached hereto as Exhibit C. Pursuant to the Wroble Agreement, Wroble acknowledged that she would be provided "with access to the company's confidential and proprietary information, including, but not limited to, information regarding Walco products, prices, customer lists, customer preferences, marketing materials, sales plans, and proposals ("Confidential Information")." Wroble also acknowledged that her employer had "put in place certain policies and practices to keep such Confidential Information secret," and that the Confidential Information had been "developed or acquired by Walco through the expenditure of substantial time, effort and money and provides Walco with an advantage over competitors who do not know or use such Confidential Information."

17.     During the course of her employment as a sales representative for Plaintiffs, Wroble did in fact receive Confidential Information from her employer as defined in the Wroble Agreement.

18.     Wroble agreed in the Wroble Agreement "not to disclose to any person or use at any time, either during or after termination of employment … any Confidential Information" as

6

defined in the Wroble Agreement "whether or not developed by me unless such information shall have become general public knowledge by any means other than disclosure by me."

19.    Wroble further agreed in the Wroble Agreement that if she resigned from her employment, she would not engage in any "Competitive Activities" for a period of twelve (12) months following the termination of her employment.   Competitive Activities are defined in the Wroble Agreement as "(i) directly or indirectly (either as principal, agent, employee, employer, partner or in any other individual or representative capacity whatsoever) soliciting, selling or rendering services substantially similar to those performed during [her] employment with Walco to any of the customers solicited, sold to or serviced by [her] on behalf of Walco at any time during the 18 months immediately preceding termination of [her] employment with Walco; or (ii) directly or indirectly, either as principal agent, employee, employer, partner or in any other individual or representative capacity whatsoever, soliciting or inducing any officer, salesman or other employee of Walco to leave his or her employment."

20.    In the course of their respective periods of employment with Plaintiffs, Nelson, Hirsbrunner and Wroble received training and orientation, which included access to Plaintiffs' methods and operations of doing business, as well as trade secrets and confidential information, including information about Plaintiffs' customers, vendors, products, costs and pricing.

### The Walco Code of Conduct

21.    As part of their employment with Walco, Nelson, Hirsbrunner and Wroble acknowledged the Walco Code of Conduct (the "Code of Conduct"), which states as follows:

> Proprietary information of the Company and its clients plays a vital role in the Company's business, its ability to compete and its future prospects.  Directors, officers and employees may not, at any time, without the Company's prior written permission,

7

either during or after service to or employment with the Company, (a) discuss the Company's business and disclose proprietary information of the Company or any client to anyone outside of the Company without prior authority, or (b) use or permit to be used any such proprietary information for any purpose other than the performance of duties for the Company. Each individual also has an obligation to use best efforts to prevent the unauthorized disclosure of the Company's or its clients' proprietary information and to deliver to the Company all copies of proprietary information when he or she ceases to be employed by or otherwise serve the Company.

The Company's proprietary information may include information or material which has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; (d) *operational and technological information*, including plans, specifications, manuals, forms, templates, software, designs, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents.  Proprietary information also includes information received in confidence by the Company from its clients or other third parties.

*See* Exhibit D attached hereto.

### *The Animal Health Employment Handbook*

22.    After Animal Health acquired Walco, and as part of their employment, Nelson, Hirsbrunner and Wroble received an employment handbook (the "Employee Handbook") which provides, in pertinent part:

At page 7:

2.    Inside or Undisclosed Information

a)    No employee or outside consultant such as accountant, counsel, etc. may release to anyone inside or outside Animal Health International, Inc. information of a confidential nature unless the person has a need to receive such information and is authorized to have it. Questions on this should be directed to a Leadership Team

Member for clarification. An individual who has knowledge of Animal Health International, Inc.'s plans shall not use such information in any way for personal gain or for the benefit of any family member, friend or other third party.

b)  Individuals who are aware of significant Animal Health International, Inc. information before it is fully disclosed to the public shall not disclose nor discuss such data with others except as required in the conduct of their jobs. Nor shall an employee use such information for personal gain or the benefit of family, friends or any third party.

3.  Corporate Opportunities

Employees, officers and directors owe a duty to the Company to advance its legitimate business interests when the opportunity to do so arises. Each employee, officer and director is prohibited from:

a)  Diverting to himself or herself or to others any opportunities that are discovered through the use of the Company's property or information or as a result of his or her position with the Company unless such opportunity has first been presented to, and rejected by, the Company;

b)  Using the Company's property or information for personal gain or for the benefit of any family member, friend or other third party; or

c)  Competing with the Company.

At page 7-8:

CONFIDENTIALITY

Proprietary information of the Company, its customers, and its partners plays a vital role in the Company's business, its ability to compete and its future prospects. Directors, officers and employees may not, at any time, without the Company's prior written permission, either during or after service to or employment with the Company, (a) discuss the Company's business and disclose any proprietary information of the Company or any customer or partner to anyone outside the Company without proper authority, or (b) use or permit to be used any such proprietary information for any purpose other than the performance of duties to the Company. Each individual also has an obligation to use best efforts to prevent the unauthorized disclosure of the Company's, any customer's or partner's proprietary information and to deliver to the Company all copies of proprietary

9

information when he or she ceases to be employed by or otherwise serve the Company.

The Company's proprietary information may include information or material which has not been made generally available to the public, such as: (a) corporate information, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) marketing information, including strategy, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) financial information, including cost and performance data, debt arrangements, equity structure, purchasing and sales data and price lists; (d) operational and technological information, including plans, specifications, manuals, forms, templates, software, designs, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) personnel information, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary information also includes information received in confidence by the Company from its customers, partners, or other third parties.

At Page 9:

COVENANT NOT TO COMPETE

In view of the unique value to Animal Health International, Inc. of the services of its employees; because of the confidential and proprietary nature of certain information which Animal Health International, Inc. discloses to employees to facilitate doing their jobs, the training provided by the Company; and as a material inducement to Animal Health International, Inc. to enter into an employment relationship, certain covenants apply to each employee:

1. Non-solicitation of Employees: During the employee's employment with the Company or any of its subsidiaries or affiliates, and for a period of one (1) year after the termination hereof, whether voluntary or involuntary and whether with or without cause (the "Noncompetition Period"), an employee must not, directly or indirectly, solicit for employment, either directly or indirectly, for Employee or for another, any other employees of Animal Health International, Inc. employed at the date of such termination or within six (6) months prior thereto.

2. No Raid: During the Noncompetition Period, an employee must not (i) interfere with any business relationships of, or solicit the business of any customer of, Animal Health International, Inc. with which the employee has had contact or principal represented by Animal Health International, Inc. on the date of said termination or expiration or during a period of twelve (12) months prior thereto, or solicit the business of any potential customer or principal that has been

10

previously identified as a business prospect by Animal Health International, Inc. and with which Employee has had contact at any time during the twelve (12) month period preceding the date of such termination or expiration; (ii) actively encourage, either directly or indirectly, any customer, supplier or any other person or entity to cease doing business with Animal Health International, Inc.

In its discretion, the Company may require that the Noncompetition Period be extended under certain circumstances. Whenever this requirement exists, affected employees will be notified in writing, and may be asked to sign an acknowledgment, acceptance or agreement with respect to the requirement.

At Pages 22-23:

15.    Confidentiality

Proprietary information of the Company and its clients or partners plays a vital role in the Company's business, its ability to compete and its future prospects. Directors, officers and employees may not, at any time, without the Company's prior written permission, either during or after service to or employment with the Company, (a) discuss the Company's business and disclose any proprietary information of the Company or any client to anyone outside the Company, or (b) use or permit to be used any such proprietary information for any purpose other than the performance of duties to the Company. Each individual also has an obligation to use best efforts to prevent the unauthorized disclosure of proprietary information and to deliver to the Company all copies of proprietary information when he or she ceases to be employed by or otherwise serve the Company.

Proprietary information includes, but is not limited to, information which has not been made generally available to the public, such as: (a) corporate information, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) marketing information, including strategy, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) financial information, including cost and performance data, debt arrangements, equity structure, purchasing and sales data and price lists; (d) operational and technological information, including plans, specifications, manuals, forms, templates, software, designs, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) personnel information, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary information also includes information received in confidence by the Company from its clients, customers, partners or other third parties.

11

*See* Exhibit E attached hereto.

### *Nelson, Hirsbrunner and Wroble's*
### *Access To Confidential And Proprietary Information*

23.    In order to obtain, maintain and service accounts, Nelson, Hirsbrunner and Wroble utilized Plaintiffs' resources and information, including product specifications, vendors, suppliers, customer lists, pricing, cost, and quantity information, and purchasing history of Plaintiffs' customers.  During the course of their employment, these individuals also became familiar with special pricing and customer preferences.  All of this information derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

24.    Nelson, Hirsbrunner and Wroble had access to, and presently possess confidential and trade secret information belonging to Plaintiffs, including Plaintiffs' resources and information, Plaintiffs' product specifications, vendors, suppliers, customer lists, pricing, cost, and quantity information, and purchasing history of its customers.  If taken and provided to a competitor, it offers a direct blueprint of Plaintiffs' sales processes.  But for their employment with Plaintiffs, these individuals would not have had access to said information.

25.    Plaintiffs employed Nelson, Hirsbrunner and Wroble in positions of trust and confidence and provided these individuals exposure and access to extensive confidential and proprietary information belonging to Plaintiffs, including client records, contact names, addresses, phone numbers, sales histories, product preferences, service needs, and other similar

information to manage sales and develop relationships with clients, prospects and contacts in the market.

26.     Plaintiffs provided Nelson, Hirsbrunner and Wroble with confidential and proprietary information in large part because of the protections to Plaintiffs provided by the agreements entered into with these individuals and the policies binding Plaintiffs' employees.

27.     The knowledge of confidential and trade secret information now possessed by Nelson, Hirsbrunner and Wroble gives them an unfair competitive advantage now that they have left Animal Health to join IVESCO.  This knowledge allows IVESCO to target Animal Health's pricing and services in such a way as to maximize IVESCO's ability to lure away Animal Health's customers.

28.     Plaintiffs have taken reasonable measures to protect their trade secrets, confidential information, and proprietary information through the use of the employment agreements, policies, and internal practices described herein.

### IVESCO's Solicitation Of Animal Health Employees

29.     IVESCO solicited Nelson, Hirsbrunner and Wroble to take employment with IVESCO for the purpose of soliciting Plaintiffs' customers and prospects, soliciting Animal Health's employees, and misappropriating confidential and trade secret information belonging to Plaintiffs.

30.     IVESCO solicited the employment of Nelson, Hirsbrunner and Wroble with the intent that they breach their obligations to Plaintiffs, including their confidentiality and/or non-compete agreements, their duty of loyalty, their statutory duty not to disclose trade secret

information, and their obligations under Plaintiffs' company policies.

31.     Nelson, Hirsbrunner and Wroble resigned abruptly from their employment with Animal Health in March 2012 with the intent to take equivalent positions at IVESCO.

32.     Nelson, Hirsbrunner and Wroble have taken sales and/or customer service positions with IVESCO for the purpose of soliciting Plaintiffs' customers and prospects on behalf of IVESCO and taking Plaintiffs' confidential information and technology to IVESCO.

33.     IVESCO enjoys a number of distinct competitive advantages because of Nelson, Hirsbrunner and Wroble's former employment with Plaintiffs and IVESCO's hiring of these individuals.   IVESCO is now able to undercut Plaintiffs' pricing and exploit customer data compiled by Plaintiffs to put Plaintiffs at a competitive disadvantage because IVESCO has knowledge of confidential and trade secret product specifications, pricing and cost information as well as the identities of existing customer contacts, sales histories, product preferences, product vendors and suppliers.

34.     On March 31, 2012, Animal Health's counsel sent a letter to Robert W. DiMarzo, the Executive Chairman of IVESCO, informing IVESCO of Plaintiffs' restrictive covenants with Nelson, Hirsbrunner and Wroble and requesting that they cease and desist from violating their obligations to Plaintiffs.  *See* Exhibit F attached hereto.

35.     Prior to March 31, 2012, John Adent, President and Chief Executive Officer of Animal Health, contacted DiMarzo by telephone to address Animal Health's suspicions. DiMarzo stated that he was not aware of IVESCO hiring any Animal Health employees, but that he would look into it.  After receiving no response, Adent e-mailed DiMarzo about the situation,

14

and DiMarzo replied that he was on vacation and would respond on April 15.  To date, IVESCO has not provided any substantive response to Animal Health's correspondence or attempts to discuss the situation.

36.     Further, in April 2012, customers of Animal Health informed Animal Health sales representatives that they had been solicited by Hirsbrunner and Wroble in an attempt to obtain their business for IVESCO.

37.     Plaintiffs seek to enjoin IVESCO from misappropriating customer relationships and goodwill developed at Plaintiffs' expense, interfering with Plaintiffs' employment relationships and contracts, and utilizing and/or disclosing confidential product, sales, cost, and customer information that gives them an unfair trade advantage and violates the Arkansas Trade Secrets Act and Arkansas common law.

38.     Unless IVESCO is enjoined from soliciting or accepting business from Plaintiffs' customers, the damage to Plaintiffs' business will continue to grow.

39.     Plaintiffs have no adequate remedy at law, and unless IVESCO is enjoined from misappropriating confidential information for purposes of unfairly competing with Plaintiffs, IVESCO will continue to cause Plaintiffs irreparable damage.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS

40.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-39 of this Complaint as if fully stated herein.

41.     The confidential and proprietary information of Plaintiffs discussed herein constitutes a trade secret under Arkansas law.  This information is Plaintiffs' sole property and it derives independent economic value because it is not generally known to or readily ascertainable by proper means by Plaintiffs' competitors or the industry.

42.     Plaintiffs have made and continue to make reasonable efforts to maintain the secrecy of the confidential and proprietary information detailed above.  Nelson, Hirsbrunner and Wroble, as Plaintiffs' employees, acquired the confidential, proprietary, and trade secret information of Plaintiffs under circumstances which gave rise to their duty to maintain the secrecy of the information and to limit its use.

43.     The employment of Nelson, Hirsbrunner and Wroble by IVESCO requires the inevitable use of the confidential and proprietary information and trade secrets of Plaintiffs, learned by and developed through their employment with Plaintiffs.  This information is the sole property of Plaintiffs and it derives independent economic value because it is not generally known to or readily ascertainable by proper means by Plaintiffs' competitors in the industry.

44.     The disclosure of Plaintiffs' confidential and proprietary information to IVESCO constitutes a misappropriation of trade secrets under Ark. Code Ann. § 4-75-601.

45.     Unless IVESCO is enjoined from using and Plaintiffs' trade secrets, Plaintiffs will be caused irreparable and continuing harm and injury for which there is no adequate remedy at law.

16

46.    Further, IVESCO's unauthorized use of Plaintiffs' trade secrets constitutes a willful and malicious misappropriation of trade secrets within the meaning of Ark. Code Ann. §§ 4-75-601 and 607.

47.    By reason of the foregoing, Plaintiffs are entitled to a temporary restraining order and preliminary and permanent injunctions restraining and enjoining IVESCO from (a) disclosing or using any of Plaintiffs' confidential and proprietary information, and (b) prohibiting IVESCO from employing Nelson, Hirsbrunner and Wroble to prevent the inevitable use and disclosure of Plaintiffs' trade secrets.

48.    In addition, as a proximate consequence of IVESCO's conduct, Plaintiffs have suffered and will continue to suffer damages, including the loss of customers and revenue from customer sales.

**COUNT II**

**<u>COMMON LAW TRADE SECRETS</u>**

49.    Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-48 of this Complaint as if fully stated herein.

50.    The confidential and proprietary information of Plaintiffs is a trade secret under the common law of Arkansas.

51.    The taking and use of this information by IVESCO is a taking or misappropriation of trade secrets under common law.

52.    Plaintiffs are entitled to a return of their information and property, damages, costs, attorney fees, and injunctive relief, as stated above.

## COUNT III

### CONVERSION

53.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-52 of this Complaint as if fully stated herein.

54.     The taking of Plaintiffs' property, including intellectual property, trade secrets, and more, constitutes conversion under Arkansas law.  The takings were not authorized or allowed. IVESCO has failed and refused to return the materials.  The takings were intentional by IVESCO.

55.     Plaintiffs are entitled to a return of their property.  They are also entitled to costs, attorney fees, damages, and punitive damages for this intentional, wrongful act.  Specifically, Plaintiffs claim attorney fees to the extent that such conduct constitutes a felony under Arkansas law, which allows the recovery of attorney fees for an improper taking. *See* Ark. Code Ann. § 16-118-107.

## COUNT IV

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AND BUSINESS EXPECTANCIES

56.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-55 of this Complaint as if fully stated herein.

57.     Plaintiffs have had longstanding business relationships and contracts with a number of businesses, including accounts formerly managed and serviced by Nelson, Hirsbrunner and Wroble.

58.     IVESCO specifically knew of the business relationships and contracts between

18

Plaintiffs and its accounts, as well as Plaintiffs' relationships with employees.

59.     IVESCO, by soliciting and hiring Nelson, Hirsbrunner and Wroble, intentionally interfered with and caused the breach of their non-compete and confidentiality agreements, the violation of their duty of loyalty and their obligations under the Arkansas Trade Secrets Act.

60.     IVESCO, by its conduct, intentionally interfered with these business relationships, contracts, and employment relationships, without justification, to procure the breach of these relationships and contracts between Plaintiffs, their customers, accounts and employees.

61.     As a proximate consequence of IVESCO's conduct, Plaintiffs have suffered and will continue to suffer damages, including the loss of customers and revenue from customer sales.

**COUNT V**

**CIVIL CONSPIRACY**

62.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-61 of this Complaint as if fully stated herein.

63.     In the course of IVESCO's solicitation of Plaintiffs' former employees, IVESCO knowingly conspired with Nelson, Hirsbrunner and Wroble to accomplish the unlawful purpose of misappropriating Plaintiffs' trade secrets and interfering with Plaintiffs' contractual relationships and business expectancies.

64.     By resigning their employment with Animal Health and taking competing positions with IVESCO, Nelson, Hirsbrunner and Wroble have committed overt acts in furtherance of the conspiracy.

19

65.     IVESCO's conspiracy with Nelson, Hirsbrunner and Wroble was undertaken with the specific intent to harm Plaintiffs and undercut Plaintiffs' ability to compete in the marketplace.

66.     IVESCO's conspiracy with Nelson, Hirsbrunner and Wroble has proximately caused damages to Plaintiffs, including the loss of customers and revenue from customer sales.

## COUNT VI

### UNJUST ENRICHMENT

67.     Plaintiffs incorporate and reallege each and every allegation contained in paragraphs 1-66 of this Complaint as if fully stated herein.

68.     IVESCO benefited from (a) trade secrets, proprietary and confidential information belonging to Plaintiffs; (b) the misappropriation of Plaintiffs' business relationships; and (c) the misappropriation of Plaintiffs' files and records.

69.     The benefit to IVESCO was unjust in that it was not paid for by IVESCO.

70.     The failure of payment operated to the detriment of Plaintiffs.

**WHEREFORE**, the Plaintiffs, Animal Health International, Inc. and Walco International, Inc., pray for a judgment against IVESCO, including the following relief:

a.     preliminarily and permanently enjoining and restraining IVESCO, and all persons and entities acting in concert with IVESCO, including any officers, employees, agents or representatives of IVESCO, from soliciting customers or employees of Animal Health;

20

b.      preliminarily and permanently enjoining and restraining IVESCO from any further misappropriation, use and/or disclosure of trade secrets or confidential information belonging to Plaintiffs, including, but not limited to, the employment of Nelson, Hirsbrunner and Wroble, the solicitation of, and/or continuation of, business relationships with Animal Health customers based on IVESCO's knowledge of Plaintiffs' trade secrets and/or confidential information;

c.      requiring IVESCO and all persons or entities acting in concert with IVESCO, to immediately return to Plaintiffs all original records or documents and any copies in whatever form, of the Confidential Information and/or proprietary information, as defined in the employment agreements, the Code of Conduct and the Employee Handbook;

d.      An award of compensatory damages, in an amount to be determined at trial, costs, and attorney fees pursuant to Ark. Code Ann. § 4-75-607 for IVESCO's unlawful actions against Plaintiffs; and

e.      Punitive damages in an amount to be determined at trial.

Respectfully submitted,

Michael S. Moore
Khayyam M. Eddings
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
Phone: (501) 376-2011
Fax:   (501) 376-2147

Clifford W. Plunkett (95158)
R. Christopher Lawson (93083)
FRIDAY, ELDREDGE & CLARK, LLP
3425 N. Futrall Drive, Suite 103
Fayetteville, Arkansas 72703
Phone: (479) 695-1888
Fax:    (479) 695-2147

Attorneys for Animal Health International, Inc. and
Walco International, Inc.


By: _____
        _____ Michael S. Moore (82112)

22